In re Cathy S. HOLLER, Debtor,

Cathy S. Holler, Plaintiff,

v.

Fairbanks Capital Corporation Servicing Center, Defendant.

Bankruptcy No. 03–20308 TPA. Adversary No. 03–2129 TPA.

United States Bankruptcy Court, W.D. Pennsylvania.

May 15, 2006.

Cathy Holler, Pro Se Debtor.

Kristen Little, for Defendant.

### *MEMORANDUM OPINION*

THOMAS P. AGRESTI, Bankruptcy Judge.

The matter before the Court for consideration is the Complaint of the *pro se* Debtor, Cathy S. Holler, entitled "Amended Objection to Claim" filed against Fairbanks Capital Corporation Servicing Center, Defendant. In light of the final state court judgment rendered prior to the filing of the within bankruptcy, the Court lacks subject matter jurisdiction to entertain the matter pursuant to the *Rooker–Feldman* doctrine. Therefore, for the reasons expressed below, the Debtor's Complaint is dismissed.

### *FACTS*

Debtor filed her voluntary Chapter 13 petition on January 9, 2003. Fairbanks Capital Corporation ("Fairbanks") filed its

1. The "Exhibits" referred to herein are the trial exhibits and, unless otherwise indicated, admitted of record on consent of the Parties.

2. Counsel for Fairbanks indicated in its letter response to Debtor that a Pooling and Servic-

proof of claim on January 31, 2003 asserting a secured mortgage lien claim against the Debtor's residence with a payoff in the amount of $54,652.35 as of the date of filing, which included arrearages of $11,880.88. On February 27, 2003 the Debtor filed her initial "Objection to Claim" directed against the Fairbanks claim. On March 3, 2003 the Court directed the Clerk to make a "corrective entry" converting the Objection to an adversary proceeding pursuant to *Fed. R. Bankr.P. 3001* since the "objection" was joined with claims for relief of the kind specified in *Fed.R. Bankr.P. 7001.* Thereafter, on September 20, 2004, pursuant to a subsequent Court Order, the Debtor amended her Objection and filed her *pro se* Complaint entitled "Amended Objections to Claims" (hereinafter "Complaint").

On July 2, 1997, Debtor originally obtained a mortgage from Resource One Consumer Discount Co. in the amount of $46,200.00. Ex. C.[1] The mortgage was assigned to Conti Mortgage Corp. ("Contimortgage") on July 9, 1997. Ex. C. Debtor's mortgage was apparently part of a pool of assets, in this instance mortgage loans, which was identified in the mortgage foreclosure complaint as the "Securitization Series 1997–4." Ex. 57. The Securitization Series identified was, in fact, a Pooling and Servicing Agreement. Ex. 10; *See also* Ex. 8, ¶ (B)(1), *Defendant's Response to Order of Court.*[2] The Pooling and Servicing Agreement, dated as of September 1, 1997, was between several parties including Contimortgage as Seller and Servicer and Manufacturers & Traders Trust Company ("Manufacturers & Traders Trust") as Trustee. Ex. ZZ. Pursuant

ing Agreement is utilized when the pool of loans is privately owned and a securitization agreement is utilized when the pool of loans is collateral for publicly traded stocks or bonds. Ex. 10.

to the Pooling and Servicing Agreement, Contimortgage remained as the servicer of the loans. *Id.*

An Asset Purchase Agreement was entered into between Contimortgage and Fairbanks on May 12, 2000 pursuant to which Fairbanks was to service certain enumerated loans on behalf of Contimortgage. On May 17, 2000 Contimortgage filed a Chapter 11 bankruptcy petition in the United States District Court for the Southern District of New York. An order of court dated June 21, 2000 was entered approving the Asset Purchase Agreement between Contimortgage and Fairbanks. Ex. EEE. Contimortgage then provided a Limited Power of Attorney to Fairbanks dated July 31, 2000 as its attorney-in-fact to service certain mortgage loans based on the Asset Purchase Agreement between the parties. That Limited Power of Attorney was recorded in the Court of Common Pleas for Beaver County on September 8, 2000. Ex. E. On September 19, 2000, pursuant to the terms of the Pooling and Servicing Agreement, Manufacturers & Traders Trust also provided a Limited Power of Attorney to Fairbanks appointing Fairbanks the servicer for the Trust pursuant to the terms of the agreement entered into between Contimortgage and Fairbanks. The Limited Power of Attorney provided by the Trust was recorded in the Court of Common Pleas for Beaver County on February 15, 2002. Ex. F.

Although the Pooling and Servicing Agreement between Contimortgage and Manufacturers & Traders Trust was dated September 1, 1997, the assignment of Debtor's mortgage from Contimortgage to Manufacturers & Traders Trust was not recorded in the Court of Common Pleas until January 8, 2003. Ex. D. The Assignment of Mortgage was executed by Fairbanks on behalf of Contimortgage through its Limited Power of Attorney. *Id.*

On January 25, 2001, the initial complaint in foreclosure was filed after the Debtor allegedly defaulted on her loan since no payment had been received since June, 2000. Shortly thereafter Debtor applied for funds to apply to her mortgage debt through a program known as Homeowners Emergency Mortgage Assistance Program with a state agency, Pennsylvania Housing Finance Agency ("HEMAP"). The application was approved by letter dated February 13, 2001. The closing on the note and mortgage did not occur, however, until October 2001. The HEMAP funds were then applied to Debtor's mortgage debt by Fairbanks on or about November 12, 2001. Ex. FFF.

This infusion of funds from the HEMAP loan resulted in the forbearance by Fairbanks of foreclosing on Debtor's property. Fairbanks moved to discontinue the mortgage foreclosure complaint in January 2002. The funds were applied to the mortgage as payments for June 2000 to November 2001. Despite the application of funds provided by the HEMAP loan to the debt, Debtor again was considered in default. A review of the loan transaction history appears to show that the HEMAP funds brought the Debtor current through October 2001. However, because Debtor was in arrears prior to the HEMAP funds being applied, Fairbanks asserts that those funds went to pay arrearages and therefore brought the Debtor current only through October 2001. Debtor, on the other hand, contends that the HEMAP funds resulted in an overpayment of approximately $1500.

Thereafter, the Debtor did not timely maintain her monthly mortgage payment obligation. As a result, a second complaint in mortgage foreclosure was commenced in June 2002. Ex. 57. Debtor did not answer or otherwise respond to or defend the complaint. A default judgment was en-

tered on October 22, 2002 in the amount of $51,764.67.[3] No motion or petition to open or strike the default judgment was filed by the Debtor.

Throughout the time Debtor was in pre-petition default, she sought the assistance of various local legislators and others seemingly to no avail. At some point in time prepetition, a class action lawsuit was filed against Fairbanks in another judicial district in which Debtor opted out of being in a class of plaintiffs that participated in a monetary settlement. Pursuant to the pending foreclosure sale following the entry of default judgment, a Sheriffs Sale of the property was scheduled for January 13, 2003.

### PROCEDURAL BACKGROUND

On January 9, 2003, Debtor filed her voluntary Chapter 13. On January 31, 2003, Defendant Fairbanks filed its proof of claim in the amount of $54,652.35 including the arrearage claim from February 2002 to the filing of the case. Debtor then objected to Fairbanks' claim. An Amended Objection to Claim ("Complaint") was filed after an initial hearing following which time the Debtor was given an opportunity to amend and include other allegations and causes of action being orally raised by her at the hearing. Discovery has been conducted and numerous discovery disputes have been brought to the attention of the court and resolved.

The Complaint not only includes language objecting to the Fairbanks claim but also includes a "Summary of Fairbanks Illegal Practices" that is comprised of neither factual allegation nor a cause of action but rather appears to be language inserted perhaps from some other document possibly of some relevancy outside of this case. Debtor's objections appear based more on Fairbanks alleged unfair trade practices *in general* rather than any specific allegations as to Fairbank's actions in regards to her particular loan. As best the Court can divine, the Debtor makes numerous factual allegations that are suggestive of causes of action, some of which appear to be alleged in the factual allegations and some of which appear in the latter portion of the filing, designated as "Objection to Fairbanks Claims."[4] For example, at ¶ 36,

---

3. The judgment order was not submitted as part of the record at trial. The absence of the judgment order in the record is puzzling to the Court; however, at trial Debtor did not *dispute that the order was entered.* Based on the evidence and admissions the Court concludes that the judgment was entered. *See* Ex. R, Praecipe for Judgment, Ex. LL, Debtor's Discovery Responses, at Request for Admission # 18, Debtor denies entry of judgment *in rem* on October 22, 2002 in amount of $51,764.67. In response to corresponding Interrogatory # 18 seeking basis for denial of Request for Admission # 18, Debtor *states* that the question is "unintelligible, ambiguous and incomprehensible" and that she has no knowledge of the averment. Such a response to is tantamount to an admission.

4. Specifically, the Debtor claims Fairbanks was a "debt collector" at the time of an initial foreclosure proceeding against the Debtor's property in August, 2000 when it first failed to timely deliver to the Debtor "loan histories and pay off information" when requested by her. (*Complaint* ¶ 15) When the information was ultimately tendered, the information was allegedly "incomprehensible." (*Complaint* ¶ 17) Thereafter, when the Debtor attempted to refinance Fairbanks' arrearage claim through receipt of a state financial loan (*Complaint* ¶ 19), Fairbanks again allegedly failed to disclose the outstanding amounts due it hindering the Debtor's ability to finally implement the refinancing. (*Complaint* ¶ 21) When the Debtor later tried to refinance the first mortgage, because Fairbanks "did not cooperate", that attempt failed. (*Complaint* ¶ 22) In February of 2000, Fairbanks initiated another foreclosure proceeding by tendering an Act 91 Notice even though, according to the Debtor, the loan was never in default. (*Complaint* ¶ 27) Then, in June 2002, a second Complaint in Mortgage Foreclosure was filed and served on the Debtor. (*Complaint* ¶ 28)

Debtor asserts that the claim of Fairbanks is invalid because she has overpaid or prepaid her mortgage. In the same numbered paragraph, Debtor further asserts that her mortgage was "illegally obtained from the CFN Trust." At ¶ 38, Debtor makes a general allegation that she has been "held hostage" due to Fairbank's "schemes and fraud" and that she missed out on a low interest development loan as a result. Such allegations appear to go to the issue of damages.[5]

The Debtor further asserts in that portion of the Complaint entitled "Objection to Fairbanks Claim" located at the end of the Complaint that "Fairbanks", as part of a "planned business practice, breached its duty" by intentionally (a) failing to timely credit loan payments thereby creating late fees and other deficiencies so as to generate foreclosures on consumers' homes; (b) assessing unauthorized charges; (c) illegally accelerating notes; and, (d) pursuing foreclosure in lieu of other legal remedies.

Following this litany of allegations, ostensibly serving as the Debtor's basis for relief, she ends her Complaint with additional, general allegations claiming: (1) Fairbanks fraudulently entered default judgment without providing any proof of her debt; (2) Fairbanks' actions in this regard were "illegal, predatory and unconscionable"; (3) Fairbanks should not "be allowed to gouge and then foreclose on a loan" not otherwise in default; and, (4) Fairbanks' fraudulent and predatory practices forced the Debtor into bankruptcy. *See Complaint,* Document No. 30.[6]

Debtor's alleged advance payments were determined, in part, through a summary judgment motion filed by Fairbanks. After an extensive record colloquy[7] by the Court with the Debtor in an attempt to understand and possibly resolve the payment credit issue, the Debtor's claim that she actually paid her debt in advance was essentially resolved with limited exception.

---

The Debtor also claims this collection attempt was misguided since the basis for the default was the Debtor's alleged failure to secure homeowner's insurance, which the Debtor alleges she previously paid. (*Complaint ¶ 31*) Although it is alleged that on October 17, 2002, the Debtor attempted to notify Fairbanks of the existence of the homeowners insurance, that same day Fairbanks entered default judgment against the Debtor in the then-pending state foreclosure action. (*Complaint ¶ 32*) It is upon these "facts" that the Debtor claims that: (1) Fairbanks' claim is invalid since the Debtor "has overpaid and/or prepaid her mortgage payments" and therefore the amount claimed, including prepayment penalties and other costs, is incorrect (*Complaint ¶ 36*); (2) Fairbanks' mortgage was illegally obtained from the CFN Trust (*Complaint ¶ 36*); and, (3) Fairbanks, along with Contimortgage held the Debtor "hostage" by their "schemes and fraud" (*Complaint ¶ 36*).

5. In Paragraph 38 of the Complaint, in the form of a claim for damages, the Debtor alleges that as a result of these "schemes and

fraud" the Debtor missed out on an opportunity to obtain a $14,000 low interest Redevelopment Authority of Beaver County, PA home improvement loan and help from the SBA following a natural disaster because of "this credit rating." No proof was offered at the time of trial as to either of these events.

6. In Paragraph 37 of the Complaint, the Debtor also claimed that the Federal Trade Commission determined that Fairbanks had "overcharged and collected over $10,531 in illegal fees from the Debtor." (*Complaint ¶ 37*). the Debtor attempted to assert this event as an independent basis for relief. Since this allegation arose out of and related solely to a settlement offer from the FTC that the Debtor acknowledged she neither accepted nor participated in, upon objection by Fairbanks at the time of trial, the Debtor was precluded from offering any testimony of the settlement as an independent basis or proof of liability. *Fed.R.Evid. 408.*

7. *See Transcript of Hearing on, inter alia, Motion for Summary Judgment,* May 19, 2005, at 80–126, Document No. 94.

But for resolution of the issue involving the credit of an alleged $1200 payment by the Debtor and allocation of loan proceeds from HEMAP for an emergency assistance loan, summary judgment was entered in favor of Fairbanks with the Court finding that all other payments were properly credited. *See Order of Court* dated January 25, 2006, Document No. 137. Evidence of the remaining two issues of "payment" was reserved to the time of trial.[8]

Thereafter, trial was held and the Parties were given an opportunity to file briefs on the legal issues raised at trial as each deemed relevant and appropriate. The matter is now ripe for decision.

## ANALYSIS

### Subject Matter Jurisdiction—Rooker– Feldman Doctrine

■ At the outset, it is important to note that this Court has been ever mindful of the issue of subject matter jurisdiction which has been "lurking" throughout this proceeding. Although Fairbanks did not specifically raise the issue until the conclusion of the trial, this Court's subject matter jurisdiction can be raised at any time in the proceeding, even on appeal. *Kontrick v. Ryan*, 540 U.S. 443, 124 S.Ct. 906, 157 L.Ed.2d 867 (2004); *Brown v. Philadelphia Hous. Auth.*, 350 F.3d 338, 347 (3d Cir.2003). The Court and parties have invested considerable time and energy in attempting to determine and identify the specific objections and causes of action alleged by this pro se Debtor. While this Debtor appears to be fairly sophisticated in her pursuit of this matter, in attempting to identify her claims, she has failed to clearly articulate on the record the specific nature of her objections and/or causes of action. Sensitive to her situation, this Court has attempted to grant Debtor considerable latitude to develop and define her causes of action. Despite permitting this Debtor every opportunity to articulate her position even at this late stage of the proceedings, it is difficult, at best, to ascertain with any certainty the true nature of her claims.

Contributing further to the uncertainty was the seemingly "eleventh hour" issue raised by Debtor of the alleged improper service and notice prerequisites concerning the 2002 mortgage foreclosure complaint. As a result, the issue pertaining to the validity of the state court mortgage foreclosure judgment came into question with minimal factual or documentary development. Fairbanks offered little assistance to the Court in this regard since the facts surrounding the required sheriff's service of the mortgage foreclosure complaint were not supplied by Fairbanks until the time of trial.

■ Following trial the Court now has the benefit of additional information in terms of Debtor's causes of action as well as the status of the underlying state court judgment. To the extent federal claims are being raised by the Debtor, after reviewing the pleadings, the record and relevant case law, the Court finds that it lacks subject matter jurisdiction and is constrained from adjudicating this matter pursuant to the *Rooker–Feldman* doctrine. The doctrine, which arises from 28 U.S.C.

---

8. As to the other grounds asserted by Fairbanks, summary judgment was denied. Specifically, Fairbanks argument that Debtor's general denials should constitute admissions was denied as a basis for summary judgment but, where appropriate, Fairbanks was permitted to use the general denials at the time of trial as matter of proof in support of its defenses. Summary judgment on the basis of *res judicata* or claim preclusion was also denied on the grounds that an issue of fact regarding notice of the mortgage foreclosure proceeding remained in dispute and required further proof at trial.

§ 1257, prevents "inferior" federal courts from sitting as appellate courts for state court judgments. *In re Knapper*, 407 F.3d 573, 580 (3d Cir.2005). The doctrine applies to those cases "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Ind. Corp.*, 544 U.S. 280, 125 S.Ct. 1517, 1521, 161 L.Ed.2d 454 (2005). A claim is barred under the doctrine:

> [F]irst, if the federal claim was actually litigated in state court prior to the filing of the federal action or, second, if the federal claim is inextricably intertwined with the state adjudication, meaning that the federal relief can only be predicated upon a conviction that the state court was wrong. In either case, *Rooker–Feldman* bars a litigant's federal claims and divests the District Court of subject matter jurisdiction over those claims.

*Knapper*, 407 F.3d at 580.

▪ Because default judgment was entered in the state court, the issue of whether the matter was "actually litigated" is not pertinent here. Rather, this court must look to the second prong of the test, i.e., whether the federal claim is "inextricably intertwined" with the state adjudication. A federal claim is considered to be "inextricably intertwined" with an adjudication by a state court when the federal court must determine that the state court judgment was erroneously entered in order to grant the requested relief sought or must take an action that would negate the state court judgment. *Walker v. Horn*, 385 F.3d 321, 330 (3d Cir.2004); *Desi's Pizza, Inc. v. City of Wilkes–Barre*, 321 F.3d 411, 421 (3d Cir.2003).

▪ Giving the Debtor the benefit of every doubt, as best the Court can ascertain from her pleadings, the Debtor's assertions that she was not properly served and failed to receive appropriate notice are suggestive of a lack of jurisdiction and/or due process argument. Under no interpretation of her Complaint does the Debtor seek to strike or open the state court judgment. Rather, apparently her challenge is a constitutional one directed against the state court judgment.[9] Therefore, in order to conclude that the state court lacked jurisdiction as a result of ineffective service or that Debtor was denied her due process rights, this Court would have to find that the state court judgment was erroneously entered. Such a determination is the very kind of finding that the *Rooker–Feldman* doctrine prevents this Court from making.

A recent decision of the United States Court of Appeals for the Third Circuit, *In re Knapper*, 407 F.3d 573 (3d Cir.2005), is

---

9. The Debtor contended that she was not personally served with the complaint and therefore the state court had no jurisdiction to enter the judgment. In Paragraph 28 of her Complaint, the Debtor pled that "[i]n June 2002, Debtor got served with another foreclosure complaint." *Complaint*, ¶ 28. At trial, the Debtor further testified for the first time that she did not receive a Pennsylvania Act 6 notice as required prior to Fairbanks initiating the foreclosure. In Paragraph 27 of her Complaint, the Debtor states that "[o]n February 8, 2002 Fairbanks started another foreclosure proceeding with another Act 91 Notice even though the note was never in default." *Complaint* ¶ 27. Fairbanks countered that Debtor's allegation concerning the failure to receive the pre-filing notices is meritless since the Act 6 Notice required to be sent is now included in the Act 91 notice which the Debtor admits in her pleading as having received. Regardless, it is clear to the Court the Debtor believes the state court judgment is subject to jurisdictional attack on due process grounds for lack of notice purposes.

particularly illustrative, factually similar and controlling. In *Knapper*, a Chapter 13 debtor attempted to set aside state foreclosure sales on the basis that it was conducted in violation of her due process rights. As is the claim of this Debtor, Knapper contended that service of process was defective and the state court did not have personal jurisdiction over her. She did not contest the matters in state court and default judgments were entered. Upon filing her fifth bankruptcy, Knapper filed an adversary proceeding seeking to set aside default judgments, foreclosures and sheriffs sales. The Court of Appeals found that Knapper could not have prevailed on her federal claim without obtaining an order that would negate the state court judgment and therefore ruled Knapper's "federal claim" was inextricably intertwined with the state court adjudications. Accordingly, Knapper's claim was barred by the *Rooker–Feldman* doctrine. The fact that Knapper's claims were "cloaked in the guise of an adversary proceeding in bankruptcy court" did not alter the court's finding. *Id.* at 581.

Similar to the debtor in Knapper, here the Debtor seeks to have the state default judgment ignored on the basis of alleged defective service. Like Knapper, the Debtor did not appear in state court to petition the court to open or strike the default judgment. Instead, the Debtor, like Knapper, has come to bankruptcy court to attempt to have this Court essentially negate the default judgment. The judgment sought here by the Debtor, as in Knapper, can only be predicated upon a voiding of the state court adjudication. As the Court of Appeals stated in *Knapper*, the Debtor's

> [c]onstitutional claim would just as surely "change the state court result," because the federal judgment she is seeking would reduce the state court judgments to nullities. That is precise-

ly what *Rooker–Feldman* prohibits, and federal subject matter jurisdiction over Knapper's "bankruptcy" claim is therefore precluded by the *Rooker–Feldman* doctrine.

407 F.3d at 582.

Debtor's argument concerning the ownership of her loan has similar implications for the application of *Rooker–Feldman*. In this proceeding, Debtor raised an issue concerning ownership of her loan at the time of foreclosure. In *Piotrowski v. Federman and Phelan LLP*, 2005 WL 3118031 (M.D.Pa. Nov. 22, 2005), the creditor obtained a prepetition default judgment in a mortgage foreclosure action against the debtors pursuant to a motion for summary judgment. The debtors alleged that the defendants violated various state and federal statutes concerning debt collection, credit reporting and consumer protection. Debtors raised an issue regarding the assignment of their mortgage and whether proper service of the summary judgment motion was effected. The District Court found that debtors' allegations were premised on an alleged improper mortgage assignment to the Defendant. Further, the legality of defendant's conduct with respect to the federal claims turned upon the validity of the mortgage assignment to the Defendant. If the court were to find that the assignment was improper, defendant's standing to bring the foreclosure action would have been called into question. "Such a finding would necessarily 'negate the state court's judgment' ". *Id.* at *4. The court concluded that it lacked subject matter since the lawsuit was "inextricably intertwined" with the state court judgment and fell within *Rooker–Feldman*. *Id.*

If this Court were to reach the conclusions and fashion a remedy of the kind this Debtor is seeking, it would require a finding that service of process and other re-

quired notices in the state court action were improper and/or the plaintiff in the mortgage foreclosure action, the claimant herein, was not the owner of her mortgage and therefore did not have standing. As in *Knapper* and *Piotrowski*, such conclusions are "inextricably intertwined" with the state court judgment and would necessarily negate the state court default judgment. The *Rooker–Feldman* doctrine precludes such a determination and deprives this court of subject matter jurisdiction. *Knapper, supra.*[10]

Even if jurisdiction was appropriate, based on the record created at trial, the

Debtor fares no better. Fairbanks would retain its secured claim against the subject property in the amount identified in its Proof of Claim.

### Evidence at Trial

For purposes of trial, the only factual matters concerning payment by the Debtor and allocation of those payments by Fairbanks centered on the status of an alleged $1,200 payment by the Debtor to Fairbanks, and, the appropriate allocation of the $11,547.32 HEMAP loan toward establishing the principal mortgage balance due as of the Petition date in the amount of $43,418.72.[11] At the time of

**10.** The defense of *res judicata* was raised for the first time in Fairbanks' Motion for Summary Judgment. It was not raised as an affirmative defense in Fairbanks' Answer to the Complaint despite the requirement of *Fed. R. Civ.P. 8(c)*. *See Select Portfolio Servicing Inc. f/k/a Fairbanks Capital Corporation's Answer to the Debtor's "Amended Objections to Claims"* filed on 10/16/2004. Document No. 35. By the same token, the Debtor never objected to the manner of or belated raising of the defense. In its Motion for Summary Judgment, Fairbanks argued that based upon the state court default judgment, *res judicata* (now commonly referred to as claim preclusion) applied to prevent the Debtor from asserting arguments regarding the validity of the mortgage or the amount of the claim as a result of the mortgage. However, at the time, based on the then-current record, the Court was unable to conclude that claim preclusion was applicable, or summary judgment appropriate, since based on a liberal reading of the *pro se* Complaint and resolving all inferences in her favor, the Debtor had raised an issue of fact regarding service of the mortgage foreclosure complaint. See Debtor's *Complaint* filed at Document No. 30 where the Debtor concludes in the final paragraph with the general allegation that "Fairbanks took a default judgment fraudulently. . . ." This mantra evolved into a notice and due process argument at the time of the summary judgment argument which, in light of its timing and the posture presented, the Court opted to delay decision of the issue until the time of trial. Until testimony was elicited at trial, the validi-

ty of the default judgment entered in the mortgage foreclosure proceeding remained at issue. Accordingly, absent further proof developed at trial, the Court was unable to determine if *res judicata* was applicable. It is for this reason that although the Court denied summary judgment prior to trial on the basis of *res judicata*, application of the doctrine was not barred in its entirety. Rather, the Court required additional proof to determine applicability of the doctrine. Upon a showing at trial of adequate proof surrounding the service of the mortgage foreclosure complaint, dismissal based upon claim preclusion remained available. Based on the Court's belief that *Knapper* controls the outcome in this case, any discussion of the claim preclusion issue on procedural due process grounds is rendered moot.

**11.** The "payment issue" was previously "fine tuned" as a result of the record colloquy between the Debtor and the Court at the time of the hearing on the Summary Judgment Motion. *See Transcript of Hearing, inter alia, on Summary Judgment,* May 19, 2005 at 80–128, Document No. 94. The January 25, 2006 Order issued by the Court resolving Fairbanks' Motion for Summary Judgment found the principal balance as of the date of filing the Petition correct except as to how it may be affected by alleged various credits, i.e., that "interest and other charges as stated in the Defendant's Proof of Claim are correct except as possibly modified" by resolution of the above two factors at trial. *See Order of Court,* Jan. 25, 2006 at Document No. 137.

trial an additional issue concerning the possible credit due the Debtor by Fairbanks regarding the issue of "force placed" insurance by Fairbanks at the time of the application of the HEMAP funds was subsequently allowed. The Debtor contended that she in fact had purchased insurance for the premises and should not have been charged for placement of the same. Fairbanks denied that it was ever provided proof of the Debtor's purchase of this insurance. Finally, the loan ownership issue and the Debtor's claims regarding Fairbanks' alleged fraudulent conduct and illegal, predatory loan practices, remained outstanding to be determined at trial.

As previously noted, a fair review of the Complaint clearly demonstrated that no violations of any federal statutes were specifically pled. Although, a very liberal reading of the Complaint may have given rise to some claims under traditional federal causes of action, because of the lack of specificity, at best, those additional claims concerning the alleged "illegal and predatory" and/or fraudulent schemes of Fairbanks, were vague and amorphous. The Complaint did set forth sufficient language to articulate a "traditional" objection to claim, i.e., the alleged failure of Fairbanks to properly credit her mortgage and other payments.

■■■ Burdens of proof in bankruptcy litigation vary with the context and the cause of action asserted. As to those causes of action in this adversary forming the basis of fraud and predatory lending practices, the Debtor as Plaintiff, has the burden of proof. *In re Verrone*, 277 B.R. 66, 73 (Bankr.W.D.Pa.2002); *Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am.*, 551 F.Supp. 1239, 1242 (W.D.Pa.1982) ("In civil cases, it is the Plaintiff who bears burden of proving its claim …"). Regarding those matters in the "traditional"

nature of an objection to claim, the burden of proof shifts throughout the course of the proceeding. Initially the claimant, Fairbanks, must allege sufficient facts to support its claim and once done, the claim becomes *prime facie* valid. Thereafter, the burden of going forward shifts to the party objecting to the claim, here, the Debtor, to produce evidence to negate the *prima facie* validity of the claim. If the Debtor produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove validity of the claim by a preponderance of the evidence. *In re Allegheny Intern., Inc.*, 954 F.2d 167 (3d Cir.1992); *In re Chiro Plus, Inc.*, 339 B.R. 111, 113 (D.N.J.2006); *In re United Companies Fin. Corp.*, 267 B.R. 524 (Bankr. D.Del.2000).

■■■ In the concluding paragraph of her Complaint, the Debtor alleges, *inter alia*, that Fairbanks "took a default judgment fraudulently without providing any proof of the debt". *Complaint*, p. 9. Debtor also references alleged "fraudulent schemes" involving Fairbanks at ¶ 38. The party asserting fraud bears the burden of proving it. *In re Forman Indus., Inc.*, 280 B.R. 609, 618 (Bankr.W.D.Pa. 2002). Fraud must be proven by clear and convincing evidence. *Id.* In Pennsylvania, in order to prove fraud, six elements must be shown: (1) a misrepresentation; (2) material to the transaction; (3) made falsely; (4) with the intent to mislead another to rely upon it; (5) justifiable reliance; and (6) the injury was proximately caused by the reliance. *Santana Products, Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 136 (3d Cir.2005) *citing Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534 (Pa.Super.Ct.2003).

■■■ Also, in the final paragraph of her Complaint, again without any specificity, the Debtor references "illegal predato-

ry practices". Typically when the term "predatory" is associated with "lending" as part of the allegations in an adversary proceeding, such phraseology conjures up notions of violation of the *Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq.* (FDCPA) [12] or possibly some other federal or state unfair trade practice/consumer protection act violation. But here, as previously noted, the Debtor has failed to articulate in her pleadings any specific federal or state cause of action premised on a violation of any of the above referenced statutory consumer protection mechanisms.

At trial, the Debtor introduced testimony of several witnesses presumably in attempt to demonstrate some sort of fraudulent scheme or "illegal and predatory" lending practice on the part of Fairbanks and further corroborate the difficulties the Debtor experienced in obtaining information from Fairbanks. The Debtor presented Victoria Ann Fratangeli, who, at the relevant time period, was an experienced legislative assistant to a PA state representative. Ms. Fratangeli testified that she recalled a monetary issue existing regarding Debtor's mortgage but did not have a specific recollection of the particular issue and that "problems" developed sometime after Debtor obtained the HEMAP loan proceeds. She recalled transmitting correspondence and corresponding on behalf of the Debtor on numerous occasions but not receiving any written response from Fairbanks. Exs. 28, 60. On cross examination, Ms. Fratangeli conceded that the delay in the Debtor receiving funds from HEMAP could have been on the part of HEMAP or the mortgage company.

Attorney Michael Yurchesen testified that he provided assistance to the Debtor in attempting to obtain a loan history as a result of the Debtor's concern over the correct amounts being applied to principal and interest and the assessment of late charges. Atty. Yurchesen's testimony supported the Debtor's claim that she experienced difficulty in obtaining the information she desired from Fairbanks but nothing rising to the level of any fraudulent conduct.

Mary Ellen Hayden of the nonprofit Association of Community Organizations for Reform Now (ACORN) also testified ACORN assisted the Debtor although she was not the individual working directly with the Debtor on the Fairbanks matter. Ms. Hayden possessed no personal knowledge of ACORN's involvement in assisting the Debtor but did provide testimony that the Debtor came to ACORN with a "confusing problem" as a result of what Hayden referred to as "poor record keeping" on the part of the mortgage company. The Debtor sought assistance from ACORN, sometime in early 2003 and subsequent to the bankruptcy filing after seeking approval for the HEMAP loan. Hayden testified that typically ACORN assisted homeowners in the HEMAP loan application process but did not do so here

**12.** The FDCPA creates a cause of action against a "debt collector" using "any false, deceptive, or misleading representation or means in connection with the collection of any debt" *15 U.S.C. § 1692e.* "The sixteen subsections of *Section 1692e* provide a nonexhaustive list of practices that fall within the statute's ban." *Bentley v. Great Lakes Collection Bureau,* 6 F.3d 60, 62 (2d Cir.1993). In determining if a defendant's communications were false, deceptive or misleading within the meaning of the Act, courts apply the "least sophisticated consumer" standard. Under this standard, the "communication" at issue violates the FDCPA if it is likely to deceive or mislead a hypothetical "least sophisticated debtor." *Brown v. Card Service Center* 2005 WL 1527707 (E.D.Pa. June 28, 2005), *Kiliszek v. Nelson, Watson, & Associates* 2006 WL 335788 (M.D.Pa. Feb. 14, 2006.)

since the Debtor was beyond that point at the time of contact with ACORN. Although Ms. Hayden did testify that other individuals sought assistance from ACORN as a result of mortgages involving Fairbanks, she offered no further specifics.

The Debtor also provided, without objection, the testimony of Mr. Gene Salvati, a defendant in a mortgage foreclosure and a subsequent eviction action. Mr. Salvati testified that he assisted the Debtor in her attempts to obtain records in their endeavors regarding their respective disputes concerning their mortgages. Mr. Salvati contended that the entity that brought his foreclosure action did not own his mortgage. He stated that his mortgage had been sold four times in four months and when he called a phone number on a mortgage interest statement, the call was answered as "Select Portfolio, formerly known as Fairbanks." Although he did not have a power of attorney or a signed release from the Debtor to obtain information, he attempted to obtain information at the same time for both himself and the Debtor. As was the case with Ms. Fratangeli and Ms. Hayden, and in large part, Atty. Yurcheshen, the testimony of Mr. Salvati did not shed any light on the relevant mortgage in question.

None of these witnesses provided any specific detail regarding the loan between the Debtor and Fairbanks. The Debtor pled a course of conduct on the part of Fairbanks amounting to "illegal and predatory" fraudulent practices requiring this Court to enter an order eliminating its claim altogether or reducing it to an unsecured claim. However, the only possible "course of conduct" demonstrated by the above testimony, in its very best light, is that at certain times Fairbanks may have been difficult to deal with in obtaining loan information. The evidence presented did not rise to the level of "illegal and predatory conduct" involving fraudulent schemes or loan practices and was not indicative of anything specific to the Debtor's loan. Nor did it provide clear and convincing evidence of fraud or "fraudulent schemes" in this instance. The proof offered by the Debtor in this regard failed to establish by clear and convincing evidence any of the elements required to prove fraud regarding Fairbanks' handling of this particular loan transaction.

The Debtor, acting *pro se*, was in the unique posture of calling herself to the witness stand and simultaneously acting as both counsel and witness. She initially read a narrative statement as part of her "testimony" to the extent relevant to her substantive claims, but also raised a number of other allegations, most of which were not originally pled in her Complaint.[13]

---

**13.** For the first time at trial, during her narrative statement, the Debtor claimed a specific violation of § 1692g of the FDCPA. In her testimony the Debtor contended that Fairbanks was mandated to send her a "debt validation notice" in relation to its "debt collection" activities. No attempt was made to amend her pleadings to include this claim. The only possible interpretation of the Complaint that may support a previously articulated § 1692g FDCPA claim may be found in Paragraph 16 where the Debtor alleges "Fairbanks did not give Debtor *any platform to validate* the debt either during the Contract or five days after, or ever." *See Complaint,* ¶ 16

(emphasis added). What the Debtor actually claims in Paragraph 16 is somewhat of a mystery to the Court. Other than using the term "validate", when read in context the language does not appear to refer in any regard to § 1692g of the FDCPA. Nor can the Court divine the Debtor's intent with respect to her use of the phrase "any platform to validate". In light of the absence of any prior record evidence or argument on the issue, the Court is incapable of "connecting the dots" so as to assist the Debtor in establishing proof for her contention. Even after a very liberal reading of her Complaint, it cannot reasonably be argued that such a claim

Although the Debtor claimed Fairbanks failed to provide accurate payoff information in a timely manner, she offered no proof that Fairbanks, in its alleged capacity as a "debt collector", violated any of the general prohibitions of *15 U.S.C. § 1692e*. No "false, deceptive or misleading representations" were shown. No false representations as to the "character, amount or legal status of the debt" owed in the foreclosure action were proven. *15 U.S.C. § 1692e(2)(A)*. Nor were any "false representation or deceptive means to collect or attempt to collect" the specific debt in question demonstrated. *15 U.S.C. § 1692e(10)*. Nor did she provide any proof that Fairbanks violated the FDCPA by "threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. § 1692(e)(8).[14] In reviewing the FDCPA, it appears to this Court that these are the only sections of the Act remotely applicable to the Debtor's claims for relief. At trial the Debtor failed to articulate or identify any specific language or phrase uttered or published by Fairbanks that she felt amounted to a violation of the FDCPA. All that was shown was that the Debtor had a difficult time in obtaining certain information concerning the loan payoff from Fairbanks; not that any specific representations made by Fairbanks constituted a FDCPA violation.[15]

An affirmative predatory lending claim can be brought by a debtor in a bankruptcy proceeding. But here, the Debtor merely asserted conclusory allegations in her pleadings, and at trial, in her narrative statement, without any independent evidence supporting or substantiating the claim at trial. The Debtor demonstrated that she encountered some difficulties in obtaining loan information from Fairbanks and understanding the same on receipt, but nothing rising to the level of "illegal and predatory" and/or fraudulent schemes and practices so as to require this Court to grant substantive relief.

was included. Even if at trial the Debtor had sought to amend the Complaint at the "eleventh hour" to inject yet another new issue into the proceedings, it would have been to no avail. Throughout the pretrial phase of this litigation, up to and including trial, any alleged FDCPA violations remained a nonissue as reflected by the absence of any prior record allegation, argument or evidence of the same before the Debtor's reading of her narrative statement.

14. At the time of the Summary Judgment colloquy, *See Transcript of Hearing, inter alia, on Summary Judgment*, May 19, 2005 at 80–128, Document No. 94., it was clear to the Court that although when the Debtor obtained the loan histories she apparently did not understand the sequence of credits and transactions the loan history reports provided, they were neither "false, deceptive, or misleading" in nature nor did they falsely represent the "character, amount or legal status" of her mortgage payoff amount. The loan history reports were straightforward and understandable from a "least sophisticated debtor" standard. Once the Court took the time to chronologically "walk" the Debtor through the aggregate payment history, it became readily apparent even to the Debtor that the loan histories were correct and all payments properly applied, leaving only the $1200 payment and the HEMAP proceeds allocation issue open for purposes of offering additional evidence at the time of trial. At the time of the colloquy it appeared to the Court as if the Debtor had not previously taken the time to actually absorb the matters contained in the loan history documents, possibly due to her emotional involvement in the matter and the financial issues involved, obscuring her ability to objectively and rationally process the information given her by Fairbanks at the time. In any event, at trial, no evidence was offered as to any potential FDCPA issues/violations.

15. Nor did the testimony of any of the Debtor's other witnesses provide any support for a finding in this regard.

The facts presented at trial, as admitted by the Debtor, demonstrate that but for resolution of the $1,200 payment and HE-MAP loan allocation, a debt was owed Fairbanks.[16] Moreover, the Debtor stopped making principal and interest payments in October, 2001. Therefore, assuming all payments from the Debtor were properly credited, at the time of receiving her "Act 91" notice in June of 2002 the Debtor was actually in debt to Fairbanks. No conduct by Fairbanks amounting to a violation of the FDCPA has been demonstrated by this record. Any notice of impending legal action, and the ultimate foreclosure itself, appears based on the Debtor's failure to make payments. Fairbanks had the authority to "threaten" the action and ultimately take the action. No fraudulent lending practices or violation of the FDCPA were proven in this case.[17] Having determined no "fraudulent, illegal or predatory" practices were shown on this record by the Debtor, the only remaining issue to resolve focuses on her "traditional" objection to claim.

█ Regarding the HEMAP loan allocation issue, the Debtor referred to Exhibit LLL, the internal notes of communication by and among Fairbanks employees referred to as "Contact Notes." The Debtor testified that despite payment of the HEMAP loan proceeds in November 2001 she was considered in default status shortly thereafter. The Contact Notes for "11–12–01" showing Fairbanks daily internal communications, reflect that the HEMAP loan proceeds were posted on November 12, 2001. According to entries in the Contact Notes for "11–12–01", it ap-

peared that the HEMAP check was not sufficient to cover the deficiency according to Fairbanks. Ex. LLL, p. 18. In December 2001 the Contact Notes reflect that collection efforts resumed. Ex. LLL, p. 18. By February 2002 Debtor was again in default. Ex. LLL, p. 17. The evidence did not reflect that Fairbanks merely ignored the HEMAP loan proceeds or that the proceeds were not applied. Rather, it showed an apparent delinquency in amount. There was a several month lag period between the time that the funds were applied for and the Debtor's eligibility was determined, and, the time the proceeds were distributed. Ex. L. There was no adequate evidence presented as to the cause of the delay in distribution of the funds.

The Debtor attempted to show that Fairbanks charged for attorney fees not permitted by HEMAP. However, Phillip Pay, Contested Default Manager for Fairbanks testified that the funds were applied as instructed by the lender. He further testified that Fairbanks did not receive timely notice of Debtor's HEMAP loan application. Upon notification of the HEMAP application, the fees and costs that were imposed during the time period in which the law precludes imposition, to allow a borrower to apply for HEMAP funds, were removed. The Court finds the testimony of Philip Pay credible in this regard. Furthermore, the evidence the Debtor presented on this issue failed to demonstrate any inappropriate conduct by Fairbanks.

**16.** This finding was also admitted by the Debtor during the Summary Judgment hearing colloquy previously noted in fn. 7, 11 and 14, above.

**17.** The Debtor failed to provide any proof of "planned business practices by Fairbanks" re-

sulting in "breaching its duty by intentionally assessing" unauthorized charges or failing to timely credit payments, illegally accelerating notes, or fraudulently entering default judgments.

The Debtor also asserted that she was charged for "forced placed insurance" despite having her own insurance. Mr. Pay testified that insurance would be "forced placed" absent proof that the borrower had insurance in effect at the relevant time. Amounts for payment of insurance would have been retained by Fairbanks from the HEMAP proceeds until proof of insurance was received. Pay pointed out that insurance premiums were refunded on December 14, 2001 in the amount of $337.00 presumably upon proof of insurance. Ex. FFF, p. 2, end line. The Court finds the testimony of Philip Pay credible in this regard.

As to proof of insurance for any other applicable time periods, the Debtor presented copies of Declaration Pages from July 2001 through July 2005 which were previously provided in discovery. Ex. PP. Each of the Declaration Pages were unsigned. The Declaration Pages also appear to the Court to have all been simultaneously printed rather than being copies of documents issued over time at the relevant time period. Each of the pages reflects the name of the mortgagee as "Select Portfolio Servicing" which is the name by which Fairbanks is now known, further suggesting that all were provided at a later date. Debtor did not present any independent proof of payment of her insurance premiums. There was no evidence presented that the policy remained in force during the relevant time period. Neither the unsigned Declaration Pages nor the premium invoices represented by Ex. 25 were probative of timely insurance payment. The Debtor could easily have obtained payment receipts from her carrier or cancelled checks. None were provided.

The Debtor failed to offer substantiating testimony of payment in her narrative statement. Based on all the foregoing, the Debtor failed to sustain her burden of proof in demonstrating that the HEMAP loan proceeds were improperly applied or that forced place insurance inappropriately required.[18]

Nor did the Debtor offer any evidence at trial that the $1200 payment was improperly applied. This specific issue was reserved for trial following entry of the Order partially granting Summary Judgment in favor of Fairbanks. *See Order of Court* dated January 25, 2006, Document No. 137. None of the Debtor's witnesses addressed this specific issue. In her narrative testimony, but for a passing conclusory reference, the Debtor also failed to provide any support for her contention. As such, the Court finds the Debtor failed in her burden of provide proof to a degree sufficient to overcome Fairbanks' previous showing of "prima facie" validity of the claim.

Prior to trial, the Debtor focused considerable attention on the issue of loan ownership. This contention appeared to be based on different arguments at different times. At one time, the Debtor argued that the mortgage was "illegally obtained from the CFN Trust." *See Complaint*, ¶ *36*. At another point in time, the Debtor contended that "Securitization Agreement", also known as Manufacturers & Traders Trust Company Securities Series 1997–4, did not exist. At other times, the Debtor appeared to contend that because the assignments of mortgage were not of record prior to the foreclosure, the foreclosure was not proper.

---

18. The cumulative weight of the documentary evidence, specifically the various loan histories, coupled with the testimony of Philip Pay, more than provided *prima facie* proof of the validity of Fairbanks' claim that all the payments made by the Debtor were properly credited, thus shifting the burden of proof to the Debtor to negate the validity of the various aspects of the Fairbanks claim.

The plaintiff in the mortgage foreclosure complaint filed in the state court foreclosure action was Manufacturers & Traders Trust Company, Trustee for Securitization Series 1997–4, identified as holder of the mortgage. Ex. 57, ¶ 1(a). In the complaint, Fairbanks Capital Corp. was identified as having the loan servicing rights. Ex. 57, ¶ 1(c).[19] The basis of Debtor's contention that the loan was illegally obtained from CFN Trust is not entirely clear. Debtor did not present any evidence that her loan was owned by CFN Trust in the first instance or anything that would suggest illegality. As this Court understands it, Debtor's loan was sold in 1997 by Contimortgage to the Manufacturers & Traders Trust as part of a pool of loans. The evidence did not show that ownership of the loan changed since that time. What did change was the servicing rights to the loan. Pursuant to the Pooling and Servicing Agreement between Contimortgage and Manufacturers & Traders Trust, Contimortgage remained as servicer of Debtor's loan despite no longer owning the loan. Fairbanks then acquired the servicing rights from Contimortgage pursuant to the Asset Purchase Agreement. Limited Powers of Attorney were executed by both Contimortgage and Manufacturers & Traders Trust to Fairbanks.

■■■■ Although transfer of ownership of Debtor's loan occurred in 1997, the recording of the Assignment of Mortgage between Contimortgage and Manufacturers & Traders Trust Company was not recorded until January 8, 2003. The judgment in foreclosure was entered in October 2002 prior to the filing of the Assignment of Mortgage. Priority of a mortgage is as of the date of recording. *21 P.S. § 622.* The failure to timely record the Assignment of Mortgage could impact the validity and/or priority of the mortgage as against subsequent purchasers or mortgagees for valid consideration. *21 P.S. § 351; 21 P.S. § 444; In re Johnston,* 333 B.R. 724 (Bankr.W.D.Pa.2005). Therefore, the failure to timely record the mortgage assignment may have had an impact in terms of subsequent mortgagees or other

---

**19.** The proof of claim was filed by Fairbanks Capital Corporation Loan Servicing Center. Fairbanks is the servicer for Manufacturers & Traders Trust, the owner of Debtor's mortgage. The Debtor's complaint is filed against Fairbanks Capital Corporation Loan Servicing Center. The pleadings and exhibits filed of record and the proof adduced at trial, show that Fairbanks possessed the servicing rights for Debtor's loan on behalf of the mortgage owner, Manufacturers & Traders Trust Company, and was authorized to act on its behalf. *See* Ex. E., "Limited Power of Attorney from Contimortgage Corporation to Fairbanks"; Ex. F., "Limited Power of Attorney from Manufacturers Traders Trust Company to Fairbanks Capital"; Ex. EEE, "Order of Court dated June 21, 2000, U.S. Bankruptcy Court for the Southern District of New York." Despite this history, at various times throughout the proceedings the Debtor made much of the fact that since the Power of Attorney authorizing Fairbanks to act on behalf of Manufacturer's & Traders Trust was not filed "of record" in Beaver County, Pennsylvania until February 15, 2002, almost 2 years after its effective date and following the filing of the first mortgage foreclosure action, somehow the timing of the filing undermines Fairbanks' right to now claim ownership of her loan. The Debtor further claims in Paragraph 36 of her Complaint that the "mortgage was illegally obtained from the CFN Trust." (*Complaint* ¶ *36* ) At the time of the September 2, 2006 Pretrial Conference, the Debtor identified the basis for her claim, i.e., because the mortgage assignment from Contimortgage to Manufacturers & Traders Trust occurred "two days before the scheduled sheriff's sale after there were two foreclosures ..." the assignment to Manufacturers & Traders Trust was illegal. *Transcript of Pretrial Conference Sept. 2, 2005,* at 70–71, Document No. 116. The Court finds no merit to the Debtor's "timing" claim regarding the filing of the powers of attorney and assignment. Nor was any credible evidence offered by the Debtor at trial to further support either allegation.

lien holders. However, no subsequent purchaser or mortgagee is asserting a superior priority. Nor is the Chapter 13 Trustee seeking to avoid the mortgage pursuant to *11 U.S.C. § 544.* Therefore, the timing of the filing of the mortgage assignment is neither relevant nor presently an issue.

## CONCLUSION

For the foregoing reasons, the Debtor's Complaint is dismissed since the Court lacks jurisdiction to hear the same based upon application of the *Rooker–Feldman* doctrine in light of the final state court judgment rendered prior to the filing of the within matter. Even assuming jurisdiction to entertain the matter existed, the relief requested by the Debtor would be denied since the Debtor failed to meet her burden of proof as to the various matters at issue raised by the Debtor in her Complaint.[20]

---

20. In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits, and arguments of counsel, regardless of whether they are specifically referred to in this Opinion.